# 14-4390-cr

## 14-3104(Lead)

UNITED STAES COURTS OF APPEALS
FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA

Appellee

- against -

FENGLING LIU

Defendant-Appellant

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

# BRIEF OF APPELLLANT

Feng Ling Liu 67786-054
FCI Danbury
ROUTE 37
DANBURY CT 06811
pro se  - Defendant-Appellant

TABLE OF CONTENTS

Page

Statement of Subject Matter and Appellate Jurisdiction ................................ 1

Statement of Issues Presented ....................................................................... 1

Statement of the Case       ............................................................................. 1

Statement of Facts ......................................................................................... 2

Summary of Arguments ................................................................................ 4

Arguments ..................................................................................................... 7

Point I. Severe Prosecutorial Misconduct       .................................................. 7

    1. Initiation of the investigation in bad faith ........................................ 8

    2. Approaching defendants represented by counsel and witness
        tampering ..................................................................................... 8

    3. Prosecutor's failure to disclose exculpatory evidence and four
        recordings.................................................................................... 9

    4. Prosecutorial misconduct in tampering with computer screen
        shot.............................................................................................. 10

    5. Prosecutors created evidence through MF by recording
        Bandrich....................................................................................... 11

    6. Prosecutors introduced hearsay into evidence through the
        recordings.................................................................................... 12

    7. Prosecutors introduced evidence irrelevant to Liu ....................... 12

    8. Prosecutors' deliberate omission from their presentation of GX302
        package........................................................................................ 13

9. Prosecutorial misconduct during direct examination of Victor
and MF.......................................................................... 14

10. Prosecutor's summation not based on evidence in the record ......... 18

11. Rebuttal summation not based on evidence.................................... 26

Point II. Severe Ineffective Assistance of Counsel ....................................... 29

1. Defense failed to put on a case for the defense................................. 30

2. Defense has no defense theory........................................................... 31

3. Defense's failures to introduce evidence to build up its defense and to
impeach government witnesses' credibility................................. 32

4. Defense's inadequate cross examination of Victor and MF.............. 36

5. Defense's failure to point out severe lack of evidence against
Liu.................................................................................................. 55

6. Defense's failure to address many crucial issues and poor closing.... 58

7. Prejudice to Liu ................................................................................. 59

Point III. Sentencing Issues ............................................................................. 60

1. Enhancement for 100 or more false documents ............................... 61

2. Enhancement for Leadership Role .................................................... 64

3. Enhancement for abuse of position of trust ..................................... 67

4. Unwarranted Disparity in sentencing defendants with similar criminal
record ........................................................................................... 70

5. Forfeiture ........................................................................................... 74

CONCLUSION ............................................................................... 78

# TABLE OF AUTHORITIES

CASES:                                                          Page

Brady v. Maryland, 373 U.S.83 (1963)............................................9
Burger v. United States, 295 U.S. 78 (1935)...................................8
Lafler v. Cooper, 132 S. CT.1376 (2012)......................................60
Missouri v. Frye, 132 S. CT.1399 (2012)......................................60
Strickland v. Washington, 466 U.S. at 686 (1984)........................7
United States v. Archer, 671 F.3d 149 (2d Cir. 2011)...................61
United States v. Barrett, 178 F.3d 643 (2d Cir. 1999)...................66
United States v. Contorinis, 692 F.3d 136 (2d Cir. 2012)..............76
United States v. Hammad, 858 F.2d 834 (2d Cir. 1988)...............9
United States v. Hirsch, 239 F.3d 221 (2d Cir. 2001) .................65
United States v. Kalish, 626 F.3d 165 (2d Cir. 2010)...................76
United States v. Kaplan, 490 F.3d 110 (2d Cir. 2007) .................21
United States v. Nuzzo, 385 F.3d 109 (2d Cir. 2004)...................65
United States v. Rittweger, 524 F.3d 171 (2d Cir. 2008)..............9
United States v. Sekhon, 10-10350 (9th Cir. 2014).......................70
United States v. Stewart, 590 F.3d 93 (2d Cir. 2009)...................69
United States v. Walker, 191 F.3d 326 (2d Cir. 1999)..................64

## OTHER AUTHORITIES:

Title 18 U.S.C.
        Section 981 ...................................................................... 76
        Section 1546 .................................................................... 2
        Section 3231 ................................................................... 1
Title 28 U.S.C.
        Section 1291 ................................................................ 1

## Federal Rules of Evidence

Rule 403 ............................................................................... 13
Rule 701 ............................................................................... 21
Rule 801(d)(2)(E) ................................................................. 23

## United States Sentencing Guidelines

3B1.3 ...................................................................................... 69

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This is an appeal from a final judgment of conviction and sentence entered on November 12, 2014, after a jury trial before the Honorable Ronnie Abrams in Southern District of New York. the District Court had jurisdiction under 18 U.S.C. §3231. A notice of appeal was timely filed on November 13, 2014. This Court has jurisdiction pursuant to 28 U.S.C. §1291.

## STATEMENT OF ISSUES PRESENTED

1. Did the government engage in prosecutorial misconduct throughout the prosecution of this case which prejudiced defendant Fengling Liu ("Liu") and deprived her of a fair trial?

2. Was defense counsel ineffective in the whole process of the defense and prejudiced Liu as a result?

3. Did District Court err in calculating the sentencing guideline range and did it abuse its discretion in causing huge unwarranted disparity in sentencing?

4. Did District Court err in ordering the forfeiture with no support of evidence in the record?

## STATEMENT OF THE CASE

Liu was one of the thirty defendants arrested in the same operation. Liu was charged on December 14, 2012 in a one-count indictment with conspiracy to commit immigration fraud by submitting fraudulent asylum applications on behalf of Fengling Liu Law Office/Moslemi and Associates ("the Firm") and Bandrich and Associates ("Bandrich Firm") clients, which resulted in clients receiving Form I-94's, in violation of 18 U.S.C. §1546(a). Liu was arrested on December 18, 2012.

On April 14, 2014, Liu was found guilty after a jury trial. On November 12, 2014, Liu was sentenced to 60 months imprisonment, the statutory maximum, three years supervised release and a fine of $12,500, a judgment of forfeiture of $7,245,000 and the forfeiture of three bank accounts. Liu surrendered to FCI Danbury on January 30, 2015.

## STATEMENT OF FACTS

The government's case at trial: The evidence against Liu is the testimony of two cooperating witnesses Victor You ("Victor") and Meng Fei Yu ("MF") and one recording Government Exhibit ("GX") 154 of Liu's telephone conversations with MF. Evidence about other codefendants' fraud includes cooperating witness' Lin Chen's testimony, recordings involving other codefendants, a package of documents and Christian knowledge

material seized from the Firm, and photos of the office taken on the day of the search.

Victor testified that he worked for the Firm from August 2008 to November 2010, first full-time as storywriter and later part-time as interpreter at the asylum office. MF testified that she worked for the Firm from August 2008 to October 2011 first as paralegal and then as attorney. They both testified that when they started working for the Firm, Liu worked here full-time and reviewed the asylum applications prepared by them. Both testified that virtually all the applications prepared by them were fraudulent and Liu reviewed their draft stories and made changes without consulting clients. Appendix 77,104 ("A.") In early 2009 Troy Moslemi joined the Firm and the Firm's name was changed from The Law Office of Fengling Liu to Moslemi and Associates. MF testified that after the name change Feng Li started to take over Liu's work and reviewed her and Victor's story drafts. Both testified that Bandrich Firm was opened in May 2010 by Harry with Bandrich. A.89-94,118-119,131 In recording GX154 MF said she did not want to appear in court because she worried that a client would suddenly say, "Well she fabricated this story and she taught me how to say it." Then MF said she was willing to work in the office and she could handle seven or eight clients a day and it was just that she did not want to appear in court. A.433

MF continued, "I am particularly nervous when going to court. I am always afraid clients would blame everything on me. I worried that someone would say that we made up the story, I could not be sure of that. So I feel I am better off staying in the office." Then MF said she preferred to work in the office to do paralegal's job at a lower salary. A.437 MF said she just did not want to appear in court and she could do any work in the office such as writing stories, preparing clients. A.438 Defense called no witness and introduced little evidence.

## SUMMARY OF ARGUMENTS

**I.** Prosecutorial Misconduct: From the start of this investigation, to the discovery stage, throughout trial and all the way to summation and rebuttal summation, FBI/prosecutors continuously engaged in intentional and systematic prosecutorial misconduct and severely prejudiced Liu. The investigation was started with bad faith and there was NO probable cause to justify the initiation of the investigation of Liu. Instead of an open ended investigation, they started with the goal of convicting Liu. To accomplish that goal there are at least some indications of collusion between them and Victor and MF. They approached codefendants who were represented by counsels and tampered with witnesses. They failed to disclose exculpatory

evidence and four important tapes containing crucial information for the defense. They created evidence against Liu through MF's recording of Bandrich. They tampered with photos taken of the Firm and speculated on the improperly obtained photo to mislead jury. They introduced a lot of hearsay into evidence. They introduced irrelevant evidence into record to prejudice jury. They distorted GX302 in their presentation to jury. They engaged in severe misconduct in direct examination of Victor and MF and manipulated the process to mislead jury. In their summation and rebuttal summation they urged jury to accept their speculations, made arguments based on NO evidence in the record and mischaracterized evidence in the record and knowingly made false arguments.

**II.** Ineffective Assistance of Counsel: Defense counsels ("Defense") shows a complete lack of diligence in the whole process of the defense. Its deficient performance demonstrated clearly from the many things it should but failed to do. First, Defense failed to stop prosecutors' misconducts as listed above and was completely silent. Second, Defense did not put on a case for the defense and did not have a defense theory. Thus it had no theme to build up its defense upon. As a result, the defense work was passive, random, superficial and piecemeal in nature and missed a lot of crucial things

throughout the defense. It failed to do investigation before trial. It failed to make motion in limine before trial to exclude the hearsay and irrelevant evidence. It failed to use many of the 3500 materials and recordings both to impeach the witnesses' credibility and to build up its defense. A.72 It failed to call a number of witnesses to build up its defense. It failed to introduce into evidence many documents and physical evidence to impeach witnesses' credibility and to build up its defense. It failed to adequately cross examine prosecution's witnesses, especially the two key witnesses to impeach their credibility and to build up its defense. Without a defense theory, Defense did not have its own story to tell jury in the opening statement so as to guide them through the trial. Failing to put on a defense, it did not have its own case to summarize to make a strong closing argument. Thirdly, even without a defense theory, Defense should still address but failed to address many of the issues raised by prosecutors, such as the name change, the opening of Bandrich Firm, Liu's involvement in the fraud. They are simply too important to ignore. Similarly there is simply no reason to explain Defense's failure to point out the strength of defense's case such as the severe lack of evidence against Liu and complete lack of corroboration to Victor and MF's testimony and the many problems with their testimony.

The prejudice to Liu caused by prosecutorial misconducts and ineffective assistance of counsel is clear and huge. As a result of Defense's failures to perform its duty, "the proper functioning of the adversarial process" is "so undermined" that it failed to produce a reliably "just result". *Strickland v. Washington,* 466 U.S. at 686(1984). Had prosecutors not engaged in the various misconducts, had Defense provided competent assistance by stopping prosecutors' misconducts or remedying them afterwards and by putting on its own effective defense, jury would have seen the severe insufficiency of evidence and would very likely have reached a not guilty verdict.

**III.** Sentencing: District Court erred in calculating the sentencing guideline range and in imposing a sentence that is substantively unreasonable and in imposing a forfeiture with no support of evidence in the record.

## ARGUMENTS

### Point I. Severe Prosecutorial Misconduct

Prosecutors represent the sovereign and have a duty to act with integrity and to be fair and to make sure justice is done. *Burger v. United States*, 295 U.S. 78 (1935)

**1. Initiation of the investigation in bad faith**

No probable cause has ever been disclosed to justify the investigation of Liu. Starting with the goal to convict Liu, FBI then looked for evidence since 2009 and tried hard and long to gather evidence to convict Liu. That was how they found Victor and MF to cooperate with them. Victor and MF both engaged in filing false asylum applications sometime after Liu left the Firm. They had prepared long ago to cooperate with FBI as a way out for their crime and hoped to avoid jail time and even to accomplish other goals through cooperation with FBI. Therefore Victor and MF immediately agreed to cooperate with FBI upon being approached. A.97,121   It is not a normal cooperation but a collusion between Victor/MF and FBI.   FBI promised Victor to become a citizen by lying A.100-103 and let MF travel to China to work while on pretrial.

**2. Approaching defendants represented and witness tampering**

MF, directed by FBI/prosecutors, called codefendants Wenting Zheng and Feng Li and talked about their cases while they both were represented by counsels. This is legally impermissible. See *United States v. Hammad,* 858

F.2d 834 (2d Cir. 1988). She also called two other employees of the Firm. MF tried to persuade them all to cooperate with prosecutors to testify against Liu and not to help Liu. A.393-394 Prosecutors went further than Hammad because they were clearly trying to tamper with witnesses.

## 3. Prosecutor's failure to disclose exculpatory evidence and four recordings

Prosecutors have a duty to disclose evidence favorable to the accused that is material to guilt or for impeachment. *Brady v. Maryland*, 373 U.S.83(1963) *United States v. Rittweger,* 524 F.3d 171 (2d Cir. 2008)

FBI interviewed a number of the Firm's clients long before Liu's arrest and continued after Liu's arrest. Apparently none of them admitted fraud. Among them are Wen Xiu Ou and the "bad case" MF mentioned many times during her testimony. It is exculpatory evidence for the defense because it effectively rebuts prosecutor's argument that the Firm is a fraud mill and virtually all asylum applications are false. This is strong evidence for the defense especially because FBI did succeed in getting a number of asylum applicants of other law firms admit their fraud and cooperate with FBI. Moreover, FBI agents approached Troy Moslemi two weeks before Liu's trial and Moslemi denied any involvement in fraud or any awareness of fraud

during his work in the Firm, but FBI never disclosed to Liu anything about the interview.

Prosecutors also failed to disclose four recordings numbered 7, 11, 13 and 36 respectively which were made by FBI of Victor before Victor cooperated with FBI. They contain very important information for the defense. For example, Victor said that Liu left the Firm because her elder brother had cancer and she was **devastated** by it and therefore left the Firm. Victor also said that MF planned to let her husband apply for asylum. This supports the argument that it only occurred to MF much later that people could file fraudulent asylum applications.

**4. Prosecutorial misconduct in tampering with computer screen shot**

The computer screen shot is not the computer screen at the time of the search. The purpose of taking all the photos is to preserve the crime scene. But here, FBI photographer opened all the windows of each computer and then took photos of each window from the same computer. GX677, GX678, GX679, GX680 and GX681 are photos taken of computer H3 in this way. It is not clear which photo was the computer screen at the time of FBI raid. Therefore GX677, the draft letter, was obtained illegally. It is not clear at all when it was created and whether it was created by the Firm's employee or

sent by a client and who was using that computer. It should not be admitted into evidence. But prosecutors put a huge emphasis on GX677 claiming they caught the defendants red handed in committing fraud. Defense failed to detect the problem and failed to object to its admission for being illegally obtained and further failed to object to the speculative testimony given by Victor and MF about GX677.

**5. Prosecutors created evidence through MF by recording Bandrich**

Fearing that Liu would deny any fraud and thus ruin their whole operation of convicting Liu, FBI/prosecutors decided not to let Victor approach and record Liu. Victor's testimony basically shows that Liu was the only one he was not allowed to approach. A.98 MF's recording of Liu was made when Liu called her A.393,429,431,436

Fearing Liu would deny fraud, FBI decided not to confront Liu with the fraud but created their own evidence through MF's recordings of Bandrich. A.477-517 First, FBI let MF herself **steer the conversation** and make incriminating statements against Liu instead of eliciting them from Liu as it should be done, and then prosecutors let MF **elaborate at trial** about those statements she had deliberately made in the recordings in whatever way she wanted. A.122-128 These recordings are a product of MF's sting of

Bandrich but prosecutors present them solely against Liu. This is clearly not legitimate collection of evidence but pure creation and misuse of evidence by FBI for the purpose of convicting Liu. Defense was completely silent.

## 6. Prosecutors introduced hearsay into evidence through the recordings

Prosecutors introduced a lot of hearsay into evidence, especially recordings GX40, GX44, GX57, GX110 and GX134. Half of the contents of GX40 and GX44 are hearsays with each involving more than a dozen different unknown males and females who are clearly not co-conspirators. GX57 is completely hearsay because prosecutors have never proved that the person on the recording is a coconspirator. Defense failed to object to the admission of the hearsays and further failed to object when prosecutors read the hearsays to jury.

## 7. Prosecutors introduced evidence irrelevant to Liu

Prosecutors emphasized the family relationship between Liu and her co-defendants/relatives throughout trial and clearly managed to associate those people's criminal conduct to Liu merely through the family relationship and divert jury's attention away from the lack of evidence to show that Liu committed fraud with them or even worked with them. They simply wanted

to prove Liu's guilt by her association with her relatives. They asked jury to ignore the lack of evidence and simply to speculate that since Liu's family members committed fraud Liu must have known the fraud. Even upon Liu's request Defense still failed to object. A.639,660 Relationship between Liu and her family members should not be admitted into evidence because it has no probative value and all it calls for is jury's prejudice. FRE403 Defense also failed to show that the evidence of fraud they were talking about happened in mid 2011, more than two years after Liu left the Firm and no evidence is produced to show that she went to the office at all during that period and Lin Chen's recordings prove that Liu did not go to the office and did not get involved in the asylum applications during that period.

## 8. Prosecutors' deliberate omission from their presentation of GX302 package

Prosecutors first twisted GX302 series as a package of blank documents by deliberately not presenting the two pages of paper in GX302K which are not blank and show a client's name, date and the things he purchased and the money he paid. A.69 These two pages clearly show that this package belongs to this particular client Zhu and it was never used by him or anyone else. Otherwise it would not be here any more. Through this

twisting, prosecutors were able to mischaracterize this package of evidence as blank documents in their presentation and completely distorted the nature of this evidence. Prosecutors further let Victor speculate how the package was used fraudulently by the Firm even if he had no personal knowledge whatsoever about it. His testimony is rebutted by the very existence of this package. Had it been used for fraudulent applications, it would not have been here in the office, still complete and intact as Victor testified. A.83-87 And it was three years old and outdated and could not be used by anyone anymore. One of the major arguments made by prosecutors from the opening to the summation is that the Firm used blank documents for clients' applications on a regular basis. It is clearly a false argument intended to mislead jury. Defense did nothing to stop prosecutors' misconduct or to redress it in the cross examination or closing even upon Liu's request. A.714

**9. Prosecutorial misconduct during direct examination of Victor and MF**

Prosecutors asked for hearsay and opinion and never asked Victor or MF to testify about the specific facts such as what they heard, what they saw, but rather consistently used the word "would" throughout direct examination. Prosecutor repeatedly asked leading questions, questions without foundations and asked the same questions again and again until he got the answer he

wanted. Prosecutor often gave testimony himself in the disguise of a leading question or repeated the witness' testimony to emphasize it and mischaracterized the witness' testimony through his questions. Lots of times, prosecutor's questions asked for not personal knowledge but straightforward speculations. For detailed analysis please see Liu's Rule 29 and 33 Motion at A.530-544.

Prosecutors also clearly manipulated the process and tried to mislead jury on the overhearing issue. They wanted to establish through Victor and MF's testimony that Liu and other defendants met new clients and suggested a false claim without asking them whether they indeed suffered any persecution. But Victor and MF only overheard a little and remembered even less after many years. So prosecutor tried very hard to tie Victor and MF's testimony to what they overheard even if their testimony was actually based on their own experience of meeting clients, not what they overheard. Through the type of questions asked and the answers given, it is clear that the whole testimony on the so-called overhearing Liu's meeting with new clients is in fact not what they overheard Liu's talk but based on their own experience of meeting clients. Prosecutor clearly showed a lack of integrity in trying to mislead jury to believe Victor and MF's testimony was what they

overheard Liu. For detailed analysis, see Rule 29 and 33 Motion at A.530-533,533-541.

Almost all the questions in MF's direct examination are leading questions and To the few non-leading questions she strayed off. Clearly MF's testimony is based on a script and her testimony is to recite what is on the script. Please see the following as illustrations.

Q. And of those ten percent that were based on actual events, in your experience at the Firm, were the details of those stories changed prior to submitting the applications? A.104 [*leading question without a foundation*]

A. I'm sorry? Can you repeat the question?

Q. And in your experience, would those asylum applications contain false facts as well? A.105 [*asking the same leading question the second time*]

A. Yes.

Q. Why would they contain false facts?

A. Because most of stories were written by paralegals. Most of clients didn't provide any useful information. [*not responsive to the question asked*]

Q. What about the stories that were based on real events? [*asking the same leading question the third time*]

A. For me, for those real ones, when paralegal talking with them, we can tell whether they actually have persecution or not. If they did

suffer persecution, they can tell us their story, we know that that's their true story or not. [*not responsive to the question asked*]

Q. And if it was a true story, were there ever circumstances where details would still be changed? [*asking the same leading question the fourth time and giving testimony through leading question*]

A. Yes. Sometimes. [*finally remembering the script with the leading*]

This is how MF's direct examination was conducted from the beginning to the end. They have a script and because the script is not based on her real life experience, she often forgets the script even if she is often reminded the answer by the leading question. Then what prosecutor does is to keep repeating the same leading question again and again until MF remembers the script. In light of MF's background as an experienced litigation lawyer who has prepared clients for asylum hearings and appeared for asylum hearings before the immigration judges for more than a hundred times, testifying in court is nothing new to her. If she were testifying based on her own real life experience, it would not be so difficult for her to testify about it and it would not require the same leading question repeated four times before she could give the correct answer. As the transcripts show, Defense failed to object to most of prosecutors' misconducts and basically let them do whatever they wanted.

**10. Prosecutor's misconduct during summation**

In the summation, prosecutor often blatantly engaged in speculations and made lots of arguments based on no evidence whatsoever in the record, and sometimes even deliberately mischaracterized the evidence to mislead jury and knowingly made false arguments.

Prosecutors used inflammatory language and repeated the argument twice in the opening statement and three times in the summation that the Firm filed nearly 2000 fraudulent asylum applications and "raked in millions and millions of dollars." A.135,150,156 But no evidence was ever produced to prove either the number of fraudulent applications or the money made from them. These are very inflammatory argument and extremely prejudicial to Liu because the numbers alone will **shock** jury.

Prosecutor argued that the recordings are reliable evidence and jury can convict all defendants based on the recordings alone. A.149  In both the summation and the rebuttal summation, prosecutors mischaracterized the recordings to support their argument. They claimed MF "acknowledging the fraud on an open telephone line" and "talking about the fraud". A.155,236 This is clearly a mischaracterization of MF's words. MF did not acknowledge or talk about fraud in the telephone conversation. She just worried that clients would push all blame to her when they were caught lying in court. A.433,437

Clients often push all blames to their attorneys whenever anything goes wrong in the Immigration Court. And the Immigration Judges are harsh and they often scold attorneys or even refer them to the disciplinary committee if the case is not handled properly. That is why most attorneys are worried and stressed when they appear in court. It has nothing to do with fraud. Bandrich shared the same feelings with MF as shown in the recordings. A.504-506 She was extremely worried and stressed when she appeared before an immigration judge for a case that had many mistakes. Liu also shared the same feelings and that was why she did not respond to MF. MF knew Liu shared the same feelings and that was why after discussing with FBI, she was "instructed" to express these feelings to Liu in the recordings. A.129 Prosecutors argued that MF helped clients make up fake stories and coached them to lie, and that was why she was worried that clients would disclose her fraud to the Immigration Judge. If Liu understood what MF worried was that clients might disclose her fraud in court, not that clients would push false blames to her, then her position would NOT make sense to Liu because MF was basically saying she was willing to commit more fraud by working in the office if we go by prosecutor's interpretation. Would that give her more worries and stress? Although Prosecutors claimed that Liu engaged in the fraud with Victor and MF openly they did not let MF confront Liu with fraud

for fear that Liu would deny any fraud and thus ruin their whole operation of convicting Liu. Instead they "instructed" MF to make this ambiguous recording and then mischaracterized it as MF talking about fraud in the Firm.

In the recordings Liu not only did not admit any fraud, she also told MF to **warn clients not to lie in court** and if they did not know the answer to a question they should say so **honestly**. A.407 MF tried to elicit incriminating statement from Liu but failed. A.403

Prosecutor argued that the recordings show Liu was still in charge of the Firm in September 2012 and was in charge of hiring, assigning jobs and monitoring the asylum application process. But prosecutor failed to cite any evidence to support her argument. There is no evidence whatsoever to show Liu was still in charge of assigning jobs to employees and monitoring the asylum application process. On the contrary, Liu told MF that she spent the whole summer somewhere else and did not go to the office at all. A.395 Moreover, there is evidence to prove Liu was not involved in assigning jobs to employees nor monitoring the asylum process. Lin Chen's recordings are such strong evidence because Liu did not appear anywhere directly or indirectly in all her 13 recordings over a 13 months period even if Lin Chen repeatedly asked to see Liu. A.720-724

There is no evidence to support prosecutor's argument that the change of the Firm's name to Moslemi and the opening of Bandrich Firm were Liu's efforts to conceal her fraud. When being asked, "What was your **understanding** of why the name of the Firm changed?" Victor answered, "they don't tell us why, but [he and MF] **figure out** the name change is for safety issue." A.89-90  Here Victor clearly gave his lay opinion without laying a foundation to show his personal knowledge on this matter. FRE701 *United States v. Kaplan,* 490 F.3d 110 (2d Cir. 2007) MF testified that the Firm's name changed while she was on leave to prepare for her bar exam. MF said [Troy] and Victor told her the reason for the name change: "He said Ms. Liu doesn't want to attract the government's attention because the Firm is so big, they have so many cases." Clearly neither Victor nor MF had any personal knowledge on this matter and their testimony is pure speculation. MF admitted that she had no personal knowledge and heard from Troy and Victor. It was not clear whether it was Victor or Troy who was talking. Victor admitted he had no personal knowledge. Troy was not charged with any crime and he denied any involvement or awareness of fraud in the Firm. So he is not a coconspirator and his words are inadmissible hearsay. Therefore, prosecutor's argument based on Victor and MF's testimony is nothing more than pure speculations.

Regarding the opening of Bandrich Firm, Victor said Harry and Yolanda wanted to open their own firm and looked for office space and a lawyer and later opened the Firm with Bandrich. A.93 Victor's testimony is based on his talk with Harry and Yolanda for several times on this matter. When being asked, "What was your **understanding** of why they were opening up the new firm?" Victor answered, "Two reasons. One reason is for safety," and another reason is to be able to file more applications through the new firm. Here Victor was again asked about his "understanding" and Victor simply gave his lay opinion without laying a foundation. Victor clearly said the Firm was opened by Harry with Bandrich, and Victor said in his prior statements to FBI that Harry was the owners of Bandrich Firm. A.731-732 When being asked why the new firm was opened, MF answered that Bandrich told her Liu wanted her to open a new firm under her name, and Feng Li and Victor told her Liu did that because the Firm had so many cases, and attracted a lot of attention from the government and Liu was worried about that. A.131 MF's testimony is contradicted by her prior statements to FBI where she said on many occasions that Harry was the owner and he left his sister's firm to form his own firm. At the beginning Harry took many cases away because many clients trusted him. Later, the two firms were completely separate. A.789-790 MF's testimony shows she did not have

personal knowledge about the opening of Bandrich Firm. Her testimony was based on what Bandrich, Feng Li and Victor told her. Even assuming MF is credible, Bandrich simply said Liu asked her to open a new firm. Nowhere did Bandrich say it was for the purpose of covering fraud and she still denies that the opening of Bandrich Firm is for fraud. Feng Li left the Moslemi firm for China when Bandrich Firm was opened. He was no longer in the conspiracy and what he told MF is inadmissible hearsay because it was not made during and in furtherance of the conspiracy. FRE801(d)(2)(E) Moreover, both Victor and Feng Li were giving lay opinion regarding Liu's **motive** without laying a foundation to show their personal knowledge on this matter. And they never mentioned fraud, simply that the Firm has "so many cases". Therefore, prosecutor's argument was not supported by Victor and MF's testimony.

There is simply no evidence in the record to support prosecutor's argument that the Firm used Falun Gong materials and family planning materials to teach clients about the basic knowledge such as what is Falun Gong and what is family planning policy. A.145,146

There is no evidence in the record to support Prosecutors' argument that: clients discussed their fraudulent cases with one another and with the Firm's employees. So Feng Ling Liu, just by walking around the law firm

everyday, would have known exactly what was going on. A.152  Lin Chen's recordings show that Liu did not go to the office at all during that period. Nor is there evidence to support prosecutor's argument that Liu staffed the Firm with her family members and did not use or trust others unless they were part of the fraud, in order to avoid the detection of the fraud. A.162 Prosecutors were knowingly making a false argument when they argued that using Bandrich to head Bandrich Firm shows she was in the fraud and was thus safe to use. They disregarded the evidence in the record showing Troy Moslemi's name was used for the Moslemi firm for years and Moslemi worked for the Firm everyday, had intensive contact with clients on a daily basis and signed hundreds of asylum applications. So were several other lawyers who worked for the Firm. None of them faced criminal charge and their behaviors after FBI raid showed clearly they were not engaged in the fraud or even aware of any fraud in the Firm. Troy Moslemi denies any fraud and continues to represent clients in the Immigration Court after FBI raid. Mr. Valane is an extremely cautious person who was freaked out when he discovered that the package of documents submitted to Immigration Court which was signed by him contained careless errors. A.758 To such a cautious person, he would be the first to flee the scene if he knew there was fraud going on in the Firm. But he continued to work in the Firm for another month

after FBI raid. MF told FBI that Jishu Zhang (Jerry) was hired by the NY Asylum Office after he left the Firm. A.605-606 NY Asylum Office assisted FBI in the investigation of the Firm for several years and there was no way that they would hire him if they suspected him engaged in asylum fraud. After leaving Moslemi firm, Galvin set up her own firm across the street with two other Moslemi employees and took hundreds of clients from the Firm both before and after FBI raid, especially after FBI raid when many other law firms were hesitating to take the Firm's clients because the Firm was involved in fraud. Liu provided all above evidence to Defense but Defense chose to do nothing. A.787-788

Prosecutors first twisted GX302 in their presentation and mischaracterized it as a package of blank documents. Then they speculated that it was used to create fake documents to support clients' fake applications. Prosecutors were knowingly making a false argument because they knew that the package was not blank documents, and for two reasons they also knew that the Firm did not help clients make fake documents. First, this is the only package seized from the Firm and it was three years outdated. If the Firm indeed engaged in such practice there should be more and current such packages because the Firm had a busy practice and many cases were ongoing

at the time of the search. Second, both Victor and MF stated in their prior statements that the Firm never engaged in such practice. A.759-760

Prosecutor mischaracterized the evidence by arguing that there is nothing changed with the change of the Firm's name[1]. Moreover, prosecutor clearly ignored evidence in the record in arguing nothing changed because the evidence shows that after the name change, Moslemi joined the Firm and Liu left the Firm and stopped coming to the Firm on a regular basis and Feng Li took over Liu's job to review and revise the applications prepared by Victor and MF and signed all applications filed by the Firm. A.111

Prosecutor speculated that the notepad and the maps on the wall are used for fraud when there is no evidence at all in the record to support such argument.

Liu raised many of these problems in prosecutor's summation and requested Defense to respond in its summation, but Defense failed to do so. A.642-718

## 11. Prosecutorial misconduct during rebuttal summation

---

[1] The question asked for anything changed in terms of the Firm's operation. A.95,130 After the Firm's name change, the Firm was still an immigration law firm and still operated the same way. Of course nothing changed in terms of the Firm's operation.

In the rebuttal summation, Prosecutors vouched for witnesses' truthfulness and expressed his personal views. He started with the talk about truth and assured jury that cooperating witnesses would not lie and did not lie. In a few minutes, prosecutor used "ridiculous" five times to attack defense's argument that Liu did not learn the fraud from her family members and used "miracle" twice to show how hard it was to record Liu because "she tried very hard not to get on the phone." A.227-240 He represented the Sovereign and used that power to assure jury what is the truth and strongly expressed his personal views as shown by the repeated use of "truth" and "ridiculous". It has clearly prejudiced Liu. Prosecutor not only speculated that Liu must know the fraud simply because her family members worked for the Firm, he also used an example to show family members share secrets. His example bore no analogy to the situation here because he was talking about young kids living under one roof. They behave very differently from adult siblings and in-laws. Thus his example was extremely misleading to jury and prejudiced Liu. Prosecutor argued that the fact that Victor and MF only gave moderate testimony on Liu's involvement in the fraud rather than depicted Liu as a villain showed that Victor and MF were telling the truth. This is not only improper vouching for government witnesses, it is also intended to mislead jury because as he himself admitted that Victor and MF are both

professional liars and they have lied all the times, so they know what lies can be easily sold to jury. Jury as lay people have no idea that credibility is the most important thing to a witness not how bad he/she depicts the defendant and thus will easily be convinced by prosecutor's argument. Liu had no chance to rebut since this is rebuttal and was prejudiced by this argument. About Lin Chen's failure to meet Liu during her 13 visits over a 13 months period and many recorded phone calls, prosecutor again used a misleading example. Because his example bore no analogy to the situation. Lin Chen's visit to the Firm is totally different from the example where the customer ate in a restaurant for many times but never met the owner. The biggest difference is that Lin Chen went through the **whole** process of asylum application preparation while the customer in the restaurant only stayed in the dining area and never saw the whole restaurant. Regarding only one recording out of 60 is about Liu, prosecutor argued it was because Liu tried very hard not to get on the phone, in complete disregard to the evidence in the record. Evidence shows Liu never avoided MF and it was Liu who called MF every time and they chatted casually about everything on the phone. Regarding prosecutor's failure to produce even a single client from the Firm to testify for government, prosecutor argued that clients cannot be located and they don't want to admit fraud for fear of losing the asylum, green card

and citizenship. A.241 These facts referred to by prosecutor are never introduced into evidence and prosecutor's introducing these new facts in his rebuttal summation severely prejudiced Liu because Defense has no chance to point out to jury that FBI did approach the Firms' clients but they all denied fraud and FBI did catch applicants from other firms who agreed to testify for government, and many of the Firm's clients' applications are still pending and these clients do not have legal status and thus do not need to worry about losing them and they can be easily located because their hearing dates and places in the immigration court are public information.

In sum, prosecutorial misconduct is not inadvertent or isolated but rather intentional and systematic. The **cumulative** effect is so severe that it has caused substantial prejudice to Liu and has deprived her of a fair trial. The prejudice was **multiplied** because Defense never objected and therefore no curative measures were ever taken.

## Point II. Severe Ineffective Assistance of Counsel

To establish a claim of ineffective assistance of counsel, a defendant must show that his attorney's performance "fell below an objective standard of reasonableness," and that there is "a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* 466 U.S. 668, 688, 694 (1984).

Liu did not point out her lawyer's failures NOW with the benefit of hindsight. Liu sent many emails and documents to her attorney, pointed out the evidence and raised most of the issues and arguments both before and during trial. Liu also wrote to the judge twice and met the judge several times during trial asking her attorney to cover the issues. A.633-635 She also put some of the documents under seal. Please see the emails and documents given to her attorney before trial and unsealed documents and other documents given to her attorney during trial as A.607-719. But her attorney failed to address most of the issues and failed to make most of the arguments requested by Liu. District Court was fully informed of defense counsel's deficient performance by Liu during trial but still denied her request to be appointed as co-counsel or pro se.

## 1. Defense failed to put on a case for the defense

Besides Defense's severe deficient performance in stopping prosecutors' many misconducts throughout the prosecution of this case or in redressing them afterwards, Defense failed to put on a case for the defense. It failed to call any witness or submit any document or recordings for the

defense. All it did was cross examining prosecutors' witnesses superficially on some minor issues in an attempt to impeach their credibility and introducing 7 insignificant documents related to the cross examination.

## 2. Defense has no defense theory

Liu told Defense that her defense is that she worked with Victor from August 2008 to early February 2009 and with MF from August 2008 to mid December 2008, and during that period, Liu closely supervised them and there was no fraud committed, at least no fraud was brought to her attention. Liu left the Firm in early 2009 for various personal reasons and she invited Troy Moslemi to head the Firm and the Firm's name was changed to Moslemi and Associates in February 2009 after Liu left. Liu's involvement in Moslemi firm was very limited out of concerns for her old clients whose cases were still pending. Victor and MF prepared false asylum applications after Liu left the Firm but they planned to get themselves off the hook by cooperating with FBI and the only way to gain cooperation with FBI is to lie that they committed the fraud with Liu. Otherwise they would be useless to prosecutors and there would be no deal for them. Bandrich Firm was opened by Harry with Bandrich and had nothing to do with Liu.

However, from the little defense work done by Defense it is clear that Defense did not adopt this defense theory or any other defense theory. There was simply no defense theory. The opening statement did not demonstrate any defense theory. It failed to address many of the issues and failed to tell jury Liu's story on what had happened to guide them through trial.

**3. Defense's failures to introduce evidence to build up its defense and to impeach government witnesses' credibility**

Without a defense theory, Defense had no center around which to build up the defense. Even upon Liu's strong request, Defense failed to do the following many things to build up a strong defense.

Defense failed to do basic investigation to gather information for the defense. For example, Defense failed to get Victor's immigration court record and his application for law school. Both contain extremely important information for impeaching his credibility and building up the defense. There he said he came here to seek asylum and during his work for the Firm he met many clients who suffered persecution in China. A.764-766 These statements completely contradict his testimony in court.

Defense failed to introduce into evidence the video surveillance installed in the Firm which was seized by FBI and still in their possession. It

covers every room of the office and even the computer screen can be seen clearly. It will prove two things: The Firm's employees were doing legitimate legal work and Liu did not come to the office.

Defense failed to call FBI agent who arrested Liu and failed to introduce into evidence the voluminous documents and other things in backpack such as the iPhone and notebooks which were seized by FBI associated with Liu's arrest and still in their possession. They will show that Liu was working full-time as a New York Life Insurance agent and there was not a single piece of evidence from the voluminous documents and iPhone seized to show Liu was involved in the Firm's operation at all, let alone Liu's involvement in the fraud of the Firm.

Defense failed to introduce into evidence many documents to build up the defense such as documents requiring paralegals to follow a detailed procedure in helping clients prepare their asylum applications to make sure they get truthful, accurate and complete information from clients, documents giving clients detailed instructions on how to let their family members and friends write letters to support their applications, documents giving clients warnings for the severe consequences for filing false applications, also Harry's samples and the bad case. All these documents were provided to Defense by Liu before trial. A.447-473,735-757

Defense failed to call defense witnesses to build up the defense. Liu provided to Defense a number of witnesses including clients, colleagues and relatives. They will provide testimony directly contradicting Victor and MF's testimony. But Defense failed to call any of them. A.612-614

Defense also failed to adequately cross examine prosecution's witnesses to elicit important information to build up the defense and to impeach their credibility. These two issues are separate but also overlapped. In cross examining FBI searching agent Person, Defense failed to show the extensive and intensive nature of the search. It failed to show: It was a thorough search by 15 agents for 10 hours, covering every corner of the office, including locked containers and garbage cans. They seized files as old as 2005. They seized nine boxes of fifteen different types of documentary materials and two boxes of computer hard drives of every computer in the office and record on the printer and copy machine. Defense further failed to introduce into evidence the search logs and inventory list in the 3500 materials which will verify all the above information. A.387-392 Defense should not waive the photographer and should cross examine him on his tampering of the computer screen shot, especially. Defense failed to show that these computer screen shots also show the Firm employees were doing legitimate legal work.

Defense failed to use the rich 3500 materials to cross examine Asylum Officer on a number of issues important for the defense even upon Liu's request A.610 The most important issue is New York Asylum Office's cooperation with FBI in this investigation. FBI agents approached many asylum applicants, including Moslemi clients, through the New York Asylum Office. Defense failed to show jury that the 3500 materials show that FBI caught a number of fraudulent applicants of other firms through this way and they did admit their fraud and cooperated with FBI in other defendants' cases, but FBI failed to find a single Moslemi client who admitted any fraud in their applications. A.786

Defense failed to ask Lin Chen about the details of her contact with the Moslemi firm from the beginning to the end to show the length of time, the number of her visits, who were involved and whether Liu appeared anywhere either directly or indirectly at any stage of her asylum application preparation. Defense failed to walk jury through Lin Chen's whole recordings from her very first visit to the last one to show that Liu was not only physically absent from the office, she also did not remotely control the office in any way in the whole process of the asylum application preparation, from meeting new clients, taking cases, preparing applications, preparing clients for asylum interviews, to preparing clients for court hearings. Defense failed to elicit

evidence to show that Lin Chen asked to see Liu in her very first visit, in her second visit, and Lin Chen discussed with FBI before her last visit and she "demanded" to see Liu and made an appointment to see Liu before her last visit, which was thirteen months after her first visit, but Liu still did not see her. A.720-724 All this evidence clearly shows Liu's complete absence from the operation of the Firm and she was simply not involved with the Firm's clients or their asylum applications.

## 4. Defense's inadequate cross examination of Victor and MF

Defense failed to use the rich 3500 materials and recordings to impeach Victor and MF's credibility and to build up the defense. It failed to cross examine Victor and MF on most of their direct testimony. Even upon Liu's request, Defense failed to show that when they decided to work for the Firm they had no financial pressure and had many options available to them. A.618 There was absolutely no reason why they stayed to commit the crime. They stayed because there was no fraud at the Firm at that time. Victor and MF did not commit the fraud while they were working under Liu's supervision. They committed the crime some time after Liu left. But in order to gain cooperation with prosecutors, they had to lie about committing the fraud with Liu so as to avoid jail time. They lived in a different world from

the Firm's clients. They did **not sympathize with clients' sufferings** and thus did not want to spend the time and energy to dig out clients' persecution stories and chose to take the shortcut by making up stories for clients when the supervision became loose. This is shown by MF's testimony that clients never told her that they did not suffer persecution and Victor said in a recording that it would **take forever** if you let clients write their own stories. When they discovered that fake applications could also be granted, they planned to profit from the crime by opening their own firm and filing fake asylum applications. At the same time they also started to make preparation in case they got caught. Cooperation with FBI was the way out they had prepared for themselves for their crime. They started to make preparation to cooperate with FBI in early 2009 by taking files and documents from the Firm to protect themselves in case of FBI investigation and to use them as evidence if FBI approached them. A.96 Even before FBI approached them, they discussed and agreed that They should both cooperate with FBI if they were ever approached. They knew cooperation would avoid them the jail time. They also want to accomplish additional goals through the cooperation. Victor wanted to wipe out all his competitors through FBI's hands and MF wanted to get green card. And the only way to gain them cooperation is by lying they started to commit crimes when they worked with Liu. They knew

there was no criminal consequence for falsely admitting more crimes as long as they cooperated with prosecutors. They betrayed all their closed friends with no guilty conscience at all as MF testified. A.132 Of course they would not care at all to send Liu to jail with their lies if that was the only way to save themselves. Therefore, they immediately agreed to cooperate and showed a very casual attitude to pleading guilty. Victor said pleading guilty before judge was only **formality** and MF did not even remember the crime she pleaded to. A.603

Defense failed to cross examine Victor on most of his direct testimony to show all his lies and contradictions in his testimony and to elicit important information for the defense. Victor is a liar as admitted by prosecutor in rebuttal summation and he repeatedly lied in the past and also on the witness stand. He lied under oath in his visa application, application for Medicaid and his own asylum application. He lied under oath in his green card application, application for naturalization and application for internship to District Court. He also lied on the witness stand. He lied that he was hired by Liu to be a storywriter to write fake stories because on all prior occasions, such as his application for naturalization, his application for internships, his application to law school, his prior testimony in court at Lin's trial, Victor said his position at the Firm was legal assistant. A.725,785 Here Victor was clearly

lying on the witness stand. But Defense was silent. He lied that FBI told him who he should call and record because his recording of FBI-informant who recorded Victor before, clearly shows he could record anyone except Liu who was the only one on his not to call list. He lied that the Firm's name change in early 2009 was caused by the Houston firm case because in his prior statement to FBI he said the Firm's name change happened before the Houston firm case, and in a recording of him by FBI-informant he also said the Houston firm case happened in early 2010. A.728-730 In fact, the Houston firm indictment happened in 2007 and conviction happened in early 2010 and Victor was clearly talking about the convictions in his testimony. A.726-727 He lied that the Firm helped clients make fake documents by using the blank documents because he said clearly in the recording by FBI-informant that the Firm **never** helped clients make fake documents. A.759-760 He lied that clients did not have persecution because in his application to law school he clearly said that during his work at the Firm he came across many clients who suffered persecution in China. He lied that he came to the United States for a visit and never intended to seek asylum because he stated clearly in his application to law school that he came here to seek asylum due to his problem with the Chinese government[2].

---

[2] In his lawyer's sentencing memo, he repeated that he came here to seek

In tape 152 recorded by Victor in August 2012, Victor told Tom Zhang that Liu was completely out of the Firm's operation, not just now, but from the later days when he still worked for the Firm, and he said that at that time the Firm absolutely did not get involved in one year evidence and always let clients provide them on their own, and the Firm let clients write their stories by themselves and the Firm would not get involved. A.733 In tape 15 recorded by FBI-informant Victor said that Liu stopped going to court in 2008 and her job was mainly "to watch us". MF also admitted in the same recording that Liu required them to follow the procedures strictly. Victor also said that Liu did not come to the office for a long time, and "Now very few clients are able to see Attorney Liu. Clients have come to us for several months and they are still unable to see Attorney Liu." A.724 Defense failed to ask Victor about these recordings to show two things: there is no fraud when Liu worked in the office and supervised Victor and MF closely, and after the name change in early 2009 Liu rarely went to the office and did not get involved in the Firm's operation.

As argued before, prosecutors manipulated the direct examination to mislead jury on the overhearing issue. This issue is important because prosecutors claimed that it shows Liu's direct involvement in the fraud from

---

asylum, contradicting his testimony in court.

the very beginning of the case. But Defense was completely silent. Defense failed to elicit important evidence through FBI photographer to show the distance from Victor's desk to Liu's and through Lin Chen and the recordings to show that the Firm was extremely noisy and crowded with many people talking at the same time, with Victor and MF also talking to clients most of the time, and it was really impossible for them to overhear Liu's talk with clients. Defense failed to address the overhearing issue even upon Liu's repeated request A.619,627,628,650,669 Defense failed to show that very often clients retained the Firm after several meetings and naturally at each meeting different things were discussed. So it is impossible for them to overhear a whole meeting, let alone all the meetings with a particular client. Victor and MF could not know for sure what information was discussed and what was not discussed at all the meetings with a particular client. Many people never retained the Firm after the initial consultation. So Victor and MF could not know for sure that Liu took clients who came here for more than one year or who had suffered no persecution.

Defense completely failed to cross examine Victor and MF about the Firm's name change and the opening of Bandrich Firm even if prosecutors insisted that they were Liu's efforts to conceal her fraud. Defense failed to show through recordings and witnesses that Liu's leave was caused by the

illness and subsequent death of her brother, her own poor health, the disciplinary action against her and other personal reasons. Defense failed to point out to jury there was no evidence of fraud and all Victor and MF testified on these issues was nothing but speculations, and Victor's testimony was contradicted by MF's on whether it was a Houston firm or Boston firm and on whether the name change happened before or after the Houston or Boston firm case. Liu raised these arguments to Defense during trial. A.649-650

Prosecutors made a big fuss that Liu told employees not to talk to clients over the phone about the substance of their cases and Liu instructed employees to shred drafts and delete stories in the computer and claimed they showed Liu's guilty mind. But Defense failed to address these issues at all in the cross examination of witnesses or in the closing even upon Liu's strong request. A.630 Defense failed to point out through cross examining Victor and MF that the Firm always had the policy not to talk to clients over the phone about the substance of their cases; it did not start after the Houston or Boston firm case as claimed by Victor and MF. It was there for a reason: contents of client's asylum application, especially the details, are highly sensitive and often very emotional. You don't expect clients to discuss them in front of strangers or simply in the presence of others. Very often clients

worked in the kitchen where it was chaotic and fast paced. It would cause great inconvenience to clients and could also easily cause confusion and misunderstanding. Defense failed to point out that it is the general practice of many law firms and even prosecutors did the same thing. They did not talk to MF and Victor about their cooperation over the phone even if Victor and MF were in their quiet living rooms doing nothing. Rather they asked them to come to their office and talked to them in person every time. Defense failed to show the legitimate reason for shredding the drafts through questioning Victor and MF. To keep the drafts in the file sometimes caused confusion and mistakes because it happened before that the draft version was submitted by mistake rather than the final version. And the draft contained client's private and sensitive information and you did not want to just throw them in the garbage can directly. Defense failed to point out that it is a common practice for many companies, not just the law firms, and the law firms have a stronger reason to shred the documents. Prosecutors probably do the same thing in their office. Defense failed to point out that the first time Victor said he shredded the draft stories he did not say he only started to shred drafts after directions were given by Liu after the Houston firm case, contradicting his later testimony. A.82,90 Defense failed to show that there was no need to delete the Chinese version from the computer because it was the same as the

client's hand copied story. Therefore, there was nothing to hide even assuming there was fraud in that case. Defense failed to impeach MF by her prior contradicting statement. She said in her prior statement to FBI that Liu directed Ann to delete the drafts shortly after the Boston firm case in early 2009. A.761-762 But Ann was still in China then and didn't come until May 2009. Later MF changed her story and said that Liu directed Ann to shred the drafts in the summer of 2010. But she failed to explain why Liu asked Ann to do this in the summer of 2010 when the concern caused by the Boston firm case arose in early 2009 and she further failed to explain why Liu needed to ask Ann to do this if both Victor and MF were directed to shred the drafts and they did shred drafts as they testified.

Victor said "in the beginning, I tried to make my story more truthful and trustworthy." He specifically clarified that it was "in the beginning of my employment". A.73 "I tried to incorporate some true things happen in their life, [into] their story. "but later on, my stories pretty too long and some of my coworker complained". A.74 Victor said he did not ask clients about their persecutions because they did not have any, and he got the details for his stories from the samples and story-writing instructions prepared by Harry. Victor further said that he did not really need those samples because "I am really fluent in writing those stories." A.75 Victor said samples are previous

clients' stories and he further said that "I can remember with at least my clients who has similar story with this client and I will reference these old clients' stories." A.76

Defense failed to point out to jury the following problems with Victor's above testimony either in the cross or in the closing argument. First, Victor clearly said that as of January 2006 he had no idea on how to write his own story for his own asylum application and it only had two sentences. A.70 He also said that he never wrote stories before working for the Firm. A.71 How could he suddenly become "fluent" in writing stories? It must be some time after he was employed by the Firm. Moreover, he also said he had samples and the story writing instructions prepared by Harry to help him get the details for his stories. Harry's story writing instructions were prepared in 2009 after Liu left and the Firm's name changed and when Feng Li was supervising Victor's work and reviewed his stories. See Harry's story writing instructions as A.447-473. Defense failed to introduce them into evidence through Victor and the computer record will show the document was created in 2009 after Liu left the Firm. MF also clearly said that Harry's story writing instructions were created in early 2009 after the policy change. A.473-476 This is crucial to Liu's defense and supports her defense theory that Victor only started to write fake stories after Liu left the Firm. But Defense still

chose to be silent even upon Liu's strong request. A.682-683 Victor also said he would reference to the similar stories of his own previous clients at the Firm. This is even clearer that it happened sometime after his employment with the Firm because he could not have his previous clients' stories to reference to in the beginning of his employment. It is further corroborated by Victor's testimony that Feng Li and Tom complained to him that his stories were too long. When Liu was his supervisor, Liu reviewed his stories and had the final say on his stories. At that time, Feng Li was not involved in any way in the preparation of the asylum applications before the court hearing stage, which was usually two or three years later. How could it come to Feng Li's attention that his stories were too long? Why did Feng Li and Tom complain to Victor but not to Liu? The only explanation is that Liu must have left the office by then and Feng Li was supervising his work and reviewing his stories.

Victor said, "In the beginning, when I wrote those family planning cases I was not quite familiar about abortion because I was not a woman, and in our office, we have a colleague who used to be a family planning official, so they know about abortion more detail than I, so they would make some change to make the abortion part in the story more real." A.78 Victor then said the colleague is Lilian Miao. A.79 Victor was talking about "in the

beginning". If it was in the beginning of his employment at the Firm, which was around August 2008, he was working under Liu's supervision and Lilian had not come to the United States yet. Liu left the Firm in early 2009 and transferred all her work to Feng Li, and Lilian came to the U.S. on May 19, 2009 and started working in July 2010. How could Lilian make the abortion part in his draft more real "in the beginning" of his employment with the Firm? Either Victor was lying and such things never happened or this happened "in the beginning" of his starting to write fake stories, which happened some time after Liu stopped supervising his work and after Lilian came to work in the office. Either way, it did not happen when he worked under Liu's supervision.

Victor testified that the one year witnesses were fake because the relationships between the witness and the applicant are not close based on his opinion. A.88 Defense failed to object to Victor's testimony as opinion and question him on the validity of his testimony. Clearly it is only his speculation. If the story was made up by him including the date of entry, should Victor know the witness is fake and why did Victor need to rely on his observation to guess it is a fake witness? If he did not know the witness is fake as indicated here, it means that the case is not fake at least regarding the date of entry. Victor also said due to a change of case law the Firm **declined**

**a whole category** of male clients seeking asylum because they were no longer eligible for asylum. 3503-20 at P2. If the Firm just made up stories for clients why should it care for eligibility?

Victor and MF were both involved in making fraudulent asylum applications but it did not happen when they worked with Liu but after Liu left the Firm. Therefore, their testimony on how they committed the fraud may be truthful. But their testimony concerning Liu's involvement in the fraud is a lie, and this part of the testimony is crucial in evaluating their credibility.

In his testimony, Victor gave a long explanation on why "we" made a certain change and he used the word "we" rather than Liu. T568 Victor failed to give clear fact on how he wrote the story and how Liu changed it. But he gave very detailed explanation on why "we" should not write this way or that way. He never said Liu made such and such change to his story and told him all these reasons for making the change. Clearly he was talking about his own experience in writing and revising fake stories for his own clients because he focused on the reasons for the change and gave detailed explanations for why a change should be made in a certain way. If he were testifying on the actual changes Liu made to his draft, he would naturally focus on the changes, not on the reasons for the change, especially because according to him Liu

communicated with him in writing and it was very unlikely that Liu would write detailed reasons for the change on his draft. A.81 After leaving the Firm, Victor prepared fraudulent asylum applications for Giles firm through emails and he spent a lot of time explaining to applicants why a certain change needed to be made. A.791-831

Both Victor and MF testified that when Liu made the changes to the story, she did not talk to client to get the information. This issue is crucial to Liu's defense because reviewing and revising their drafts was not a fraud by itself and it only became a fraud when Liu did not get the information from clients but made it up instead. Liu raised this argument to Defense. A.656 But Defense failed to ask them questions to show they could not have personal knowledge on this issue and their testimony was nothing but their assertion. First, they never mentioned this in all their prior interviews with prosecutors. Second, they did not even know when Liu made the review after handing the draft stories to her for review. And they did not overhear all Liu's meetings with clients. So they did not know for sure that Liu never met this client before in the initial meeting, and they did not know for sure that Liu did not talk to clients over the phone or called clients in to talk with them in person when she reviewed the story.

Even upon Liu's request, Defense failed to produce the bad case to impeach MF's credibility and to show no fraud in that case. There is such a case. Client was approached by FBI but refused to admit any fraud in her asylum applications. Liu brought the case to Defense and explained the situations but Defense chose to do nothing. A.634,658,680 Defense failed to question MF's memory based on her failure to remember even the name of the bad case which happened in the summer of 2011 and caused her so much panic and she specifically reviewed the application again and talked to the client after the incident in the asylum office. How could we trust her recollection of things happened in 2008 such as her overhearing Liu's talk to clients and the review and change made to her drafts?

Defense failed to elicit from MF important evidence to show the Firm's practice in many other areas in addition to asylum applications, and the central role played by clients in court hearings and that Immigration Judges and government attorneys are very watchful and strict and it is very difficult to get asylum approved. This information is very necessary to rebut prosecutors' argument that Immigration Judges are easily duped and it is easy to get asylum with a fake application. Liu raised this argument to Defense before trial. A.611

MF said that Liu or other office managers would suggest family planning claim for single female clients because it is easy to prepare the story and the evidence. A.106 Defense failed to introduce evidence to impeach MF that during the period Liu worked with her, two-thirds of single female clients filed applications with Christian claim and only one-third pursued family planning claims. A.861,870-873

Regarding preparing the applications, MF testified that when she started working at the Firm, she asked clients questions about their persecutions and she prepared applications based on what they told her. So her testimony shows there was no fraud in the beginning. Later on when clients could not tell her about their persecution, she jumped to the conclusion that they did not have persecution so "I just, based on my previous year's experience, I just made up the story for them". A-108 Defense failed to point out "later on" could be after Liu left the Firm and stopped reviewing her work because it is "many people", it must be after she worked here for a while, otherwise she could not have encountered many people who could not tell her their persecutions. Most importantly, MF clearly said she used previous year's experience. Defense failed to point out that this was her first job and her "previous year's experience" in writing stories can only refer to her experience in this firm. Since she started to work

for the Firm in 2008, she must have started to write fake stories in 2009 or later. Liu only worked with her a little over four months until mid December 2008 because MF took a long leave to prepare for the bar exam and left in early January 2009 and came back in early March 2009, and Liu left for vacation around mid December 2008 until New Year. And she did testify that in 2009 Feng Li started to supervise her work. So she did not commit the fraud with Liu but after Liu left. Moreover, Defense failed to point out that at no place did MF say that clients told her they had no persecution. It was just that they could not tell her what happened and she concluded that they had no persecution. Defense should point out through questing MF that both asylum and persecution are complicated legal terms and there is a whole body of case law to explain what constitutes persecution. So it is not surprising at all if clients did not understand those terms. Client was puzzled and asked her: "I don't know about the asylum or persecution, just tell me what I should do", **not** "I have no persecution, just make up a story for me." A.109

MF said when clients did not provide her with persecution details, she used samples created by Harry to make up the stories. A.109 This again shows MF started to commit fraud on or after 2009 after Liu had already left the office and when Feng Li was supervising her work and reviewing the

stories prepared by her and Victor. Clearly she was not talking about the time when she worked with Liu.

MF said she realized that the applications were fake **a few weeks** after she worked there and when being asked the specific instance that caused her to find out, she answered that Victor **told** her. A.110 This again shows there was no fraud when she first worked there because if she really got no facts from clients and simply made up stories for them, she would know they were fake and she did not need Victor to tell her that. The only explanation is that she did not make up stories for clients, at least not by the time when Victor told her. This also shows that Liu and Victor did not engage in fraud by that date either, otherwise she would find out herself. She was basically saying there was no fraud in the beginning. The only issue is when the fraud started. Although MF claimed that it was a few weeks after she worked here, other indicators in her testimony as pointed out above show fraud started in 2009 or later. This is corroborated by her testimony that first Victor told her and then she had "more and more clients" and when they could not tell her their persecutions, she "felt" they never had persecution. "[M]ore and more clients" clearly indicates time, meaning as time goes on. It refers to some time later. It was also corroborated by MF's prior statement where she clearly said that clients wrote their own drafts and "most of the stories were ok" and

she "would ask clients questions to fill out the details". A.763 This effectively supports Liu's theory that **fraud started later** and rebuts prosecutor's argument that the Firm always engaged in fraud.

MF said Liu changed the logic and language to make her story more like a real story. A.112 Here, she really did not explain clearly how "the logic of story doesn't sound credible" and how Liu changed "the logic and language" to make it sound credible. It is very vague testimony. When she was asked to elaborate, she simply said Liu added something to her drafts to make the beating more severe. It has nothing to do with the change of the "logic and language" of her story. She still failed to explain how Liu changed the "logic and language" to make it "sounds credible, sounds better". A.113 She also failed to give the name of the client or any other specifics about the case. Defense was completely silent on these crucial testimonies both in the cross examination and closing. Defense should press for specifics and should at the very minimum point out the problems with these testimonies to impeach MF's credibility.

When asked "Were there any other details of the story she would change?" MF was not really responsive and answered, "A few times, she change the claim completely. A.113" MF here gave an example where Liu changed the claim from family planning to Christianity. One thing strange

about her testimony is that Liu never told her why the claim needed to be changed and why Liu did not let her do it. Rather MF found out from the client accidentally a few months later. She claimed Liu committed the fraud with her, why did Liu not let her continue with the case when the claim was changed? And she failed to give specifics about the case such as the name of the client. The Firm simply had no such case matching her description. Moreover, assuming there was indeed such a case arguendo, she clearly did not have personal knowledge about what actually had happened to that case and she was simply speculating there was fraud. Liu raised these problems with MF's testimony but Defense chose to do nothing. A.670-674

**5. Defense's failure to point out severe lack of evidence against Liu**

Defense failed to point out to jury that FBI has conducted a lengthy and intensive investigation against Liu since 2009 but the only evidence produced at trial against Liu is Victor and MF's testimony and one recording. They did not even find enough evidence to have a fraud charge. FBI located all the bank accounts and telephone records, both business and personal for all these past number of years. They located hundreds of asylum applications filed by the Firm and talked to a number of the Firm's clients but failed to find a single fraudulent application Liu was involved in and they failed to

produce a single client to corroborate Victor and MF's testimony. But they did manage to find fraudulent applications filed by other firms and those applicants did stand up to testify in other defendants' case. Defense failed to introduce documents or to elicit evidence from witnesses to show that clients play the central role in the asylum application process and prosecutor's failure to produce even a single client shows a major deficiency in prosecutor's case. FBI searched Liu upon her arrest and seized voluminous documents she carried on that day. They also seized her iPhone upon her arrest which has access to all her emails, text messages and notes for several years. FBI searched the office and seized voluminous documents and computers. Victor and MF took materials from the Firm since early 2009 to protect themselves in case of FBI investigation and "use them as evidence if approached by FBI" and they handed over to FBI after their cooperation. A.96,99,120 They did not produce a **single** piece of evidence incriminating Liu from all these sources[3]. This lack of evidence is very telling of Liu's innocence. Liu raised this to Defense but it chose to do nothing. A.643-646,653

---

[3] Victor's lawyer in his sentencing memo said that Victor "turned over thousands of pages of documents ... recalled names and details of close to a thousand clients of the target firms and "went through hundreds - if not more - prior asylum applications in painstaking detail to weed out which applications were fraud and which he thought were legitimate. The number of files he reviewed filled twenty-two banker boxes." A.767-774

Defense also failed to produce evidence to show that most of the Firm's clients moved their cases out after FBI raid and hired new attorneys to represent them. Their new attorneys were required by the Immigration Court to go over the asylum applications with them to verify the contents to make sure they are accurate, complete and true. None of them retracted their asylum applications as fraudulent. And the Immigration Judges applied a heightened standard to the applications filed by the Firm. By September 2014, 364 applications were granted by the Immigration Judges and 41 were denied and none was found to be fraudulent. A.777-783 Victor testified that clients with fake applications needed to be **trained again** for court hearings because they forgot what they were taught for the asylum interview due to the lapse of time. A.92 It is impossible that all the newly hired lawyers that handled the Firm's cases engaged in coaching clients and all the Immigration Judges and government attorneys failed to do their job diligently.

Defense failed to elicit evidence from witnesses and to introduce documents and recordings to show that Troy Moslemi has a lengthy and intensive involvement in the Firm but he does not face any criminal charge and he denies any knowledge of fraud. So were other lawyers of the Firm. As argued before their behaviors after FBI raid further show that they are not engaged in any fraud while working for the Firm.

## 6. Defense's failure to address many crucial issues and poor closing

Even without a defense theory, some issues are simply too important to ignore for any competent defense, especially when Defense was put on constant notice of these issues in the indictment, in prosecutor's opening statement and during trial. These issues are: Liu's leaving the Firm and change of Firm's name to Moslemi, Liu's role in Moslemi firm, Liu's role in Bandrich Firm, when Liu worked with Victor and MF, whether Liu engaged in fraud when she worked with them, whether Liu gave employees instructions such as no talk to clients over the phone, shredding and deleting drafts to cover the fraud. But Defense completely ignored them and was completely silent on these issues even upon Liu's strong request. A.678-718

Because Defense failed to do so many things to build up a defense and to impeach witnesses' credibility, it did not have its own case to sum up to make a strong closing argument. But there is still a lot it could do but failed to do to make the closing a lot stronger. Defense failed to point out to jury the severe lack of evidence against Liu and the complete lack of **corroboration** to Victor and MF's testimony. Defense also failed to point out that most of the evidence introduced by prosecutors during trial was about other codefendants fraud which happened in mid 2011, more than two years

after Liu left and had nothing to do with Liu. Defense failed to go over Victor and MF's testimony to show their strong motive to lie and the many lies they told under oath and all the problems with their testimony which clearly showed that they committed the fraud not with Liu but after Liu left the Firm. Defense failed to show the strong contrast between their detailed testimony about their own fraud which is true and the meager, vague and artificial testimony about Liu's involvement in the fraud which is a lie. Defense also failed to point out to jury that their testimony on many issues such as the name change and the opening of Bandrich Firm is pure speculations with no personal knowledge and no evidence was ever produced to show they were Liu's efforts to cover her fraud. Defense also failed to point out to jury that Liu was basically not physically present in the office since early 2009 and was not involved in the daily operation as shown by Lin Chen's recordings. Defense failed to rebut most of prosecutor's summation and failed to object to prosecutor's misconduct in the rebuttal summation.

## 7. Prejudice to Liu

In *Strickland*, the Supreme Court held that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that trial cannot

be relied on as having produced a just result." *Strictland*, 466 U.S. at 686 This holding is reiterated by the Supreme Court in two recent cases. *Lafler v. Cooper* 132 S. CT.1376(2012), *Missouri v. Frye.* 132 S. CT.1399(2012). In the present case, the numerous failures of Defense as discussed above demonstrated a severe deficient performance that so completely "undermined the proper functioning of the adversarial process" that we are not confident that the trial "produced the just result". The prejudice to Liu became even more severe because Defense's ineffective assistance is compounded by the systematic and intentional prosecutorial misconduct throughout the prosecution of this case.

**Point III. Sentencing Issues**

First, District Court erred in adopting the presentence investigation report ("PSR") because the probation officer admitted that his information came from the case agent rather than his independent evaluation of the evidence in record. In fact, the large part of the factual finding in the PSR is directly copied from the indictment. Therefore, the PSR is a repeat of the government's claims and deserves no weight.

District Court erred in imposing 9 level enhancement for 100 or more fraudulent applications, erred in imposing 4 level of enhancement for being a

leader in the crime, and erred in imposing 2 level enhancement for abuse of the position of trust. It erred in causing the huge unwarranted disparity in sentencing between Liu and other defendants with similar criminal records. It also erred in ordering forfeiture with no evidence in the record.

## 1. Enhancement for 100 or more false documents

In *United States v. Archer,* 671 F.3d 149 (2d Cir. 2011), this Court held that "to sustain quantity-based enhancements for relevant conduct, the court must base its finding on specific evidence that the offense involved the requisite quantity of items." This Court held that District Court erred in assuming Archer was responsible for 100 or more fraudulent applications based on the proved four fraudulent applications and statistics showing a pattern of fraud. This Court warned District Court to look for specific and reliable evidence in determining the number of fraudulent applications and not to assume fraud in all the other applications filed by Archer simply because Archer was convicted of fraud with four applications.

In the present case, District Court found that based on the specific evidence standard of Archer, Liu is responsible directly for 100 or more fraudulent applications based on the number of applications filed by the Firm and the various roles played by Liu, including being the boss, recruiting Troy

Moslemi and remaining in charge after that, hiring employees, training them, assigning them work, meeting new clients and discussing the types of claims they could make, reviewing the draft stories and making substantial edits, signing applications, coaching clients for their hearings, instructing Victor to attend asylum interviews, instructing her brother Harry to set up Bandrich Firm across the street to take the heat off of Moslemi. A.295-296

First, many of these factual findings are not supported by evidence in the record. There is no evidence to show the transfer to Moslemi and opening of Bandrich Firm are Liu's effort to cover her fraud. Evidence shows after the transfer Liu had very limited involvement in the Firm and she did not remain in charge. Before she left the Firm, Liu was the boss and indeed performed the various job duties as listed by District Court. But most of the job duties are not criminal in nature. Second, the factual findings are not specific enough to meet the Archer standard. The inquiry here is not what Liu did but how many fraudulent applications she was involved in. District Court simply listed all the things Liu did for the Firm. These findings are at most about what Liu did in the conspiracy and cannot prove how many fraudulent asylum applications Liu was involved in. The only evidence against Liu is Victor and MF's testimony. Although they claimed that they worked on fraudulent asylum applications with Liu, when they elaborated the process, it

actually shows they committed the fraud after Liu left the Firm. Even assuming they indeed committed the fraud with Liu, their testimony concerning Liu's part in the fraud is very vague and completely devoid of specificity. Victor only gave the name of one applicant but never produced anything even to prove the existence of that case. MF did not provide a single client's name. Moreover, after being showed hundreds, if not thousands of asylum applications, MF only identified 17 applications as fraudulent and Victor identified 54 and none of these applications involved Liu. A.928-941 They both started to take materials from the Firm since early 2009 to protect themselves in case of FBI investigation and to be used as evidence if he they were approached by FBI. Not a single fraudulent asylum application was produced to show Liu was involved in. Therefore, their vague and non-specific testimony combined with a complete lack of corroboration cannot meet the standard set by the Archer case in determining how many fraudulent asylum applications Liu was involved in.

Even assuming District Court can ignore Archer's holding and find Liu engaged in all the applications prepared by Victor and MF from August 2008 to February 11, 2009, the period when Liu supervised the asylum applications, it is not over 100. According to trial record, the total number of asylum applications during that period is 133. But many clients were

transfers with their stories already completed when they retained the Firm. The total number of stories actually prepared during the period is 85. A.890-873 And this number includes cases prepared by other employees when MF was on leave for the bar exam and when Victor was on vacation. Moreover, they never testified that Liu made false edits on every draft story she reviewed.

Liu should not be responsible for false applications filed by her coconspirators. In *United States v. Walker,* 191 F.3d 326 (2d Cir. 1999), also an immigration fraud case, this Court held that evidence shows Walker was personally responsible for 100 or more fake documents but not his codefendant Khan, and thus clearly implied that defendant is only responsible for his own criminal conduct, not his codefendant's. District Court erred in holding otherwise.

**2. Enhancement for Leadership Role**

District Court imposed the enhancement for leadership role based on the same factual findings for the enhancement for 100 or more fraudulent asylum applications. These factual findings failed to show that Liu is leader/organizer in the conspiracy. First of all, as argued above, some of the fact findings are not supported by evidence in the record and others are not

criminal in nature. This is a law firm and the Firm provides a variety of legal services. Asylum application is only one of the immigration legal services provided by the Firm. A.784 Therefore, lots of the job duties performed by Liu as listed by District Court are performed in managing the Firm. Even the job duties directly involving asylum applications are not criminal activities on their face unless all the asylum applications are fraudulent. District Court stated conclusively that the Firm was a fraud mill and everything Liu did for the Firm is criminal activity. District Court erred in ignoring the variety of other legal services provided by the Firm in addition to asylum applications. Moreover, there is no evidence to support District Court's finding that the Firm was a fraud mill. In fact, District Court is **biased** and found the Firm was a fraud mill long before trial when it justified the all record search in its decision to deny Liu's motion to suppress the evidence of the search. The Firm is not a fraud mill for the following reasons:

First, Victor and MF's testimony, even assuming credible, can only prove the applications they worked on are fraudulent. They knew nothing about the applications prepared before they came and after they left the Firm. No evidence in the record shows that those applications are fraudulent. Even during their work for the Firm, they did not know the applications prepared by other paralegals were true or false. MF admitted that she knew nothing

about those applications prepared by other paralegals even if they have her signature on them. A.932,947 And the cases they worked on are only a small portion of the total cases filed during the period covered by the indictment. Moreover, as argued above, MF only identified 17 and Victor only identified 54 as fraudulent after being shown hundreds if not thousands of applications and none of them involved Liu. Therefore, their testimony cannot prove that all the applications filed by the Firm were fraudulent.

Second, credibility is a big issue and their testimony clearly shows that they started to prepare fraudulent asylum applications not from the beginning of their employment but sometime after they worked for the Firm. So the fraud does not cover the whole period of their work for the Firm.

Thirdly, because of their strong motive to lie to gain cooperation with government and there is no criminal consequences for admitting more frauds than they had actually committed, they clearly exaggerated the number of fraudulent asylum applications. Their testimony shows clearly they lied when they claimed virtually all the applications they prepared are fraudulent. For example, MF said she learned about the fraud from Victor **after she worked there a few weeks.** She did not need Victor to tell her if 90 percent of the applications she prepared were fraudulent and if Liu made up facts on her drafts as she testified. Another example, Victor testified that he did not know

the one year witnesses are fake and had to guess from his observations. This shows Victor did not know the case was fake.

Fourthly, many of the Firm's applications were granted by many different Immigration Judges while being represented by many different new immigration lawyers hired by clients after FBI raid based on the **exactly** same applications prepared by the Firm. It is strong indication that the majority of the cases are not fraudulent and the Firm is not a fraud mill.

Fifthly, the several lawyers of the Firm faced no criminal charge and their behaviors after FBI raid showed they did not commit fraud and were not aware of any fraud during their work for the Firm. They worked for the Firm from a few months to several years and they had intensive contact with clients on a daily basis. If the Firm is a fraud mill, it is definitely impossible for them not to engage in fraud because of the **nature** of their work.

Therefore, District Court erred in ignoring all the above evidence in the record and in finding the Firm was a fraud mill simply based on Victor and MF's testimony. Since District Court's enhancement for the leadership role is based on the finding that the Firm is a fraud mill, District Court erred in imposing the enhancement for leadership.

**3. Enhancement for abuse of position of trust**

Position of trust stems from the defendant's relationship with the victim in the things entrusted to the defendant, such as a fiduciary relationship. *United States v. Hirsch*, 239 F.3d 221 (2d Cir. 2001) In *United States v. Barrett*, 178 F.3d 643 (2d Cir. 1999), this Court held that the defendant as vice president of the company was in a position of trust to his victim---the company, and the managerial discretion of his position entrusted to him by his victim subjects him to significantly less supervision than employees in other positions and greatly facilitates the commission and concealment of the offense. This Court held that District Court should use the perspective of the victim to determine whether a defendant was in a position of trust.

District Court relied on *United States v. Nuzzo*, 385 F.3d 109 (2d Cir. 2004) and found that Liu was in a position of trust to her clients and she abused that trust in helping them file false asylum applications and Liu, as an officer of the court, was also in a position of trust to the immigration court and abused that trust in filing and presenting false applications to the government and the court. a.299

District Court basically found the relationship of trust exists in any attorney client relationship and abuse of that trust arises where attorneys committed a fraud in providing the legal service. District Court ignored the

example in the application notes of §3B1.3 where it states clearly that the relationship of trust only exists in the attorney client relationship where there is a fiduciary like relationship such as the attorney acts as legal guardian for the client. In *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009), this Court suggests enhancement for abuse of the position of trust where the attorney clearly breached the government's trust in that special circumstance. Abuse of trust is always a question of abuse of whose trust? There is always a victim in the abuse of trust. This Court found Walker abused his clients' trust because his clients are victims of his crime. The present case is clearly distinguishable from Walker case because the clients are not victims. There is no evidence in the record to show any clients are victims of Liu's fraud. Government argued and court found that clients are coconspirators. District Court erred in finding that the relationship of trust exists between coconspirators. Liu simply should not be held in a position of trust to her coconspirators. Moreover, in such a relationship, there is no discretional power given by one party to the other and there is no victim. It failed both of the two prong tests. The U.S. government may be a victim of Liu's crime but there is no trust relationship between Liu and the U.S. government because the U.S. government never gives Liu any trust or managerial discretion as

held in a recent case by the Ninth Circuit. *United States v. Sekhon*, 10-10350

(9th Cir. 2014)

## 4. Unwarranted Disparity in sentencing defendant with similar criminal record

District Court abused her discretion in sentencing Liu to five years in prison, the statutory maximum sentence, creating a huge disparity that is unwarranted between Liu's sentence and the sentences of many other defendants who are similarly situated and have a similar criminal record. District Court gave the following reasons to support its decision:

Liu was the leader of the conspiracy, the boss and financially benefited the most from this crime. Liu was engaged in many aspects of the fraud ...... Liu continued to blame others, "many others throughout the course of this". A.318

Regarding the concern to avoid unwarranted disparity, District Court stated that Liu "played a more significant role than that of your codefendants in this case". District Court stated that it was aware of another lawyer Earl David who was also a leader and was sentenced to 60 months in prison and other "lawyers received guideline sentences for similar conduct". A.319-320

First, the reason for the harsh sentence is the same reason for imposing 4-level enhancement for being a leader. Liu's leadership role is already

counted in the calculation of the sentencing guideline range and the court already imposed a 4-level enhancement for the leadership role. The court erred in considering the leadership role again in rendering the sentence. By doing so, District Court actually double counted Liu's role as a leader in sentencing her. Second, some of the factual findings are not supported by evidence in the record as argued above. Regarding District Court's finding that Liu blamed many others, District Court did not give any evidence to support such finding. Liu argued pro se in her Rule 29 and 33 motion about prosecutorial misconduct and ineffective assistance of counsel. However, District Court interpreted them as blaming others and punished Liu as a result. District Court erred in punishing Liu for exercising her right to represent herself and treating her legal argument as blaming others. Thirdly, the 60 months sentence is the statutory maximum for Liu. District Court stated that Her Honor has considered the concern to avoid unwarranted disparity and mentioned that Earl David was also sentenced to 60 months in prison. But Earl David originally faced 50 years statutory maximum with four charges and pled guilty to two charges with a statutory maximum of 25 years. His criminal conduct is much more severe than Liu in many aspects. 26 people were indicted of his conspiracy. He was engaged in fraud since 1996 until 2009. His conspiracy involved the filing of at least 25 thousand fake

applications charging clients a fee up to $30000 each. His coconspirators included not only his clients, business owners, accountants, but also a government official in the United States Department of Labor. He has prior criminal history and he fled to Canada in 2006 and continued to operate in Canada. He was eventually extradited back to the United States from Canada. His sentencing guideline range is 78-97 months and he was sentenced to 60 months. Although more culpable than Liu, Earl David was sentenced below his sentencing guideline range and way below his statutory maximum. District Court is clearly wrong in sentencing Liu 60 months simply because Earl David was also sentenced to 60 months in prison, while ignoring all the other factors which clearly show he was much more culpable than Liu. By sentencing Liu the same as Earl David, District Court actually caused huge unwarranted disparity in sentencing.

District Court mentioned other attorneys who also got guideline sentence. They are Freddy Jacobs and Kenneth Giles. First, their guideline range is lower simply because the government chose to give them the lower guideline range. They were both sentenced for two years jail time, at the lower end for Jacobs and below the guideline range for Giles.

District Court erred in picking and choosing these defendants who were harshly sentenced to justify her harsh sentence of Liu. The law requires

it to consider all the defendants with similar criminal record to render a sentence that should avoid unwarranted disparity. By picking and choosing some defendants who were harshly sentenced and ignoring other defendants with similar criminal records who were leniently sentenced, District Court clearly erred in not following the law. Thirty defendants were arrested in the same takedown. They have similar criminal records as Liu. But they were either sentenced to probation or very short jail time. John Wang is one of the lawyers arrested in the same takedown and he was given a sentencing guideline range of 27 to 33 months by the government and he was sentenced to probation. Two other attorneys not related to this operation, Adam Wright and James Christo both were sentenced to probation. District Court's abuse of discretion shows especially clearly in the following chart showing the huge unwarranted disparity in sentencing by this same judge of other defendants on the one hand and Liu and her family members on the other hand. For example, Bandrich was sentenced to the same term as Shu Feng Xia even if Bandrich is a lawyer and her guideline range is 41-51 months while Xia only played a minor role as admitted by the government in Lilian and Bandrich's sentencing and his guideline range is 18-24. There is no legitimate reason to explain the huge disparity other than the judge's abuse of discretion.

| Name | Title | Offense level / Guideline range | Sentenced |
|---|---|---|---|
| WenTing Zheng | Paralegal | 14/15-21 months, Plea Agreement | 1 month jail<br>3 year supervision |
| Rui Yang | Paralegal | 17/24-30 months, Jury trial | 3 month jail<br>3 years supervision |
| Vanessa Bandrich | Lawyer | 22/41-51 months, Jury trial | 12 month jail<br>1 year supervision |
| ShuFeng Xia | Paralegal | 15/18-24 months, Pled to indictment<br>Liu's brother-in-law | 12 month jail<br>3 years supervision |
| Shuran Liu | Paralegal | 22/41-51 months, Pled to indictment<br>Liu's brother | 18 month jail<br>2 years supervision |
| GuoQin Miao | Paralegal | 18/27-33 months, Pled to indictment<br>Liu's sister-in-law | 11 month jail<br>3 years supervision |
| FengLing Liu | Lawyer | 26/63-78 months, Jury trial<br>Appellant | 60 months jail<br>3 years supervision |
| Yuchang Miao | Paralegal | 22/41-51 months, Pled to indictment<br>Liu's Husband | 41 months jail<br>3 years supervision |

## 5. Forfeiture

District Court erred in ordering the monetary judgment of $7,249,000 forfeiture and the forfeiture of three bank accounts as proceeds of the crime. There is no evidence in the record to support the court's finding.

First, District Court erred in ordering Liu jointly and severally liable for all the proceeds of the crime. There is no legal authority to support the court's findings. The case law on joint and several liability for forfeiture is

about drug cases, RICO cases and money laundering cases. There is not a single case about forfeiture in immigration fraud case. Moreover, Liu should not be responsible for Bandrich firm's fraud cases for an additional reason. The indictment never charged that the two firms are one and there is no evidence to show Liu was involved in any way in Bandrich firm. Even the court itself found that Harry was the owner of the Bandrich firm in Her Honor's finding of leadership role for Harry. A.775-776

Second, the government never produced anything to show there are a total of 1610 granted asylum applications except the affidavit of Agent DeGraff. Moreover, Agent DeGraff in his affidavit clearly stated he got this number based on his review of DHS reports. He should produce the independent sources he relied on in reaching this number and his affidavit alone is not sufficient to meet the government's burden. District Court erred in finding Agent DeGraff's affidavit is sufficient to meet the government's burden. District Court further erred in ignoring Liu's detailed analysis of the 1810 case list which was produced by the government during trial and Liu's analysis shows that there are only 331 granted cases for the Firm during the period covered by the indictment. A.907-927 Moreover, Liu's analysis is based on public information.

Thirdly, District Court erred in finding 90 percent of all the 1610 granted asylum applications are fraudulent based on Victor and MF's testimony. There is simply no evidence to support District Court's finding. Victor and MF only handled a very small portion of all the Firm's cases and the court erred in finding 90 percent of **all** the 1610 granted cases are fraudulent simply because Victor and MF said the applications they prepared are largely fraudulent.

Fourthly, District Court erred in finding $5000 was received by defendants for each granted case when there is no evidence at all in the record to support such finding.

Fifthly, District Court erred in not deducting the direct cost. In *United States v. Kalish,* 626 F.3d 165 (2d Cir. 2010), District Court found and this Court affirmed that 18 U.S.C. §981(a)(2)(B) applies and the direct cost of commissions paid to brokers should be deducted. In *United States v. Contorinis* 692 F.3d 136 (2d Cir. 2012), this Court again held that 18 U.S.C. §981(a)(2)(B) applies to the security fraud case and direct cost should be deducted. Base on the above case law, the direct cost should be deducted after the court determines the number of forfeiture. District Court erred in not deducting the direct cost. A.846-860,887-942

Regarding the money in the three bank accounts, District Court erred in finding they are proceeds of crime based on no evidence whatsoever in the record. For the JP Morgan Chase bank account, Liu informed the court that she had no interest in the bank account and the government did not produce any evidence to show that the money in the bank account is proceeds of crime or Liu had any interest in that bank account. A.887-942 Nevertheless, the judge still ordered forfeiture against Liu of the money in that bank account. A.345-346 For the other two bank accounts with Bank of America, the government produced no evidence to prove that the money in the bank accounts is proceeds of crime, while Liu explained clearly that the money was originally transferred from Liu's other two bank accounts and the money were in those two bank accounts for a long time, and the deposits made to Bank of America accounts are legal fees collected from legal services provided to non-asylum clients including relative petitions, investment immigrations, waivers based on extreme hardships, etc. They have nothing to do with asylum and the government has never claimed and never produced anything to show those other legal services are also fraudulent. Moreover, Liu's above explanation is corroborated by the bank records produced by the government. A.887-941 For detailed analysis on sentencing and forfeiture, please refer to Liu's sentencing submissions as A.832-946

CONCLUSION

For all of the reasons stated herein, Liu respectfully requests that the judgement of conviction, sentence and forfeiture against Fengling Liu be reversed, and any other relief the Court deems just and proper.

Dated: New York, NY

April 2, 2015

Fengling Liu, Defendant-Appellant

CERTIFICATE OF COMPLIANCE

I, Fengling Liu, the defendant-appellant, do hereby certify that the forgoing Brief complies with the type-volume limitation as ordered by the Court, in that the Brief is less than 18000 words.

Dated: New York, NY

April 2, 2015

_____

Fengling Liu, Defendant-Appellant

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

CAPTION:

United States _____ v.

Fengling Liu

_____

**CERTIFICATE OF SERVICE**
Docket Number: 14-4390-cr

I, Fengling Liu _____, hereby certify under penalty of perjury that on
_4/6/2015_____ (name) _____, I served a copy of _my appeal brief and_
(date)
_Joint appendix_____
(list all documents)

by (select all applicable)*

- [✓] United States Mail
- [ ] Federal Express
- [ ] Overnight Mail
- [ ] Facsimile
- [✓] E-mail
- [✓] Hand delivery

on the following parties (complete all information and add additional pages as necessary):

Rebecca Mermelstein

| Name | Address | City | State | Zip Code |
|---|---|---|---|---|
| U. S Attorney's Office | One St Andrew's Plaza | New York | NY | 10007 |
| Name | Address | City | State | Zip Code |
| | | | | |
| Name | Address | City | State | Zip Code |
| | | | | |
| Name | Address | City | State | Zip Code |

_4/6/2015_
Today's Date

Signature

*If different methods of service have been used on different parties, please indicate on a separate page, the type of service used for each respective party.

Certificate of Service Form